## Commonwealth v. Handler

LAMBERTON, J., June 30, 1933.—Defendant, Joseph Handler, was indicted under the Act of May 1, 1929, P. L. 1037, charged with making an incomplete, false, and fraudulent statement or return of liquid fuels purchased, sold, or used. His trial commenced March 21, 1933, and the jury brought in a verdict of guilty. Defendant has filed a motion for a new trial and in support thereof has filed 17 reasons in addition to the purely formal ones.

At the argument and in the brief filed, defendant rests upon three main contentions as follows:

1. There was no duty upon defendant to make any return, and therefore, he cannot be convicted of making a false or fraudulent return.

2. There was no proper evidence that the return was actually incomplete false, or fraudulent.

3. The crime, if crime there was, was committed in Dauphin County, and therefore defendant could not be tried therefor in Philadelphia County.

Of the 17 reasons filed, 4 and 6 are covered by (1) above, 1, 2, 15, and 17 are covered by (2) above, and 3 and 5 are covered by (3) above. Reasons 7, 8, 9, 10, 11, 12, 13, 14 and 16 were not mentioned at the argument or in the brief filed. We have, nevertheless, considered them all and find them without merit. The

real issues involved are covered by the three points pressed at the argument, and these only will be considered at length.

Defendant also filed a motion for arrest of judgment on grounds (1) and (3) above stated. Since these points are duplicated in the two motions, they will be considered together.

The uncontroverted facts were as follows:

Defendant was, and for a long time had been, president and one half owner of National Speedway Refining Company, a corporation engaged in the business of buying and selling gasoline, with its principal place of business at 625 Fishers Avenue, in the City of Philadelphia. Defendant signed and swore to the returns made by National Speedway Refining Company to the Department of Revenue of the Commonwealth of Pennsylvania, purporting to show gasoline purchased, sold, and used by that corporation during the months of August, September, October, and November 1930, and February and March 1931, all of which were included in the indictment. He denied that he signed the return for the month of December 1930, which was also included in the indictment. The Commonwealth contended that the returns were incomplete, false, and fraudulent, in that the number of gallons shown by the returns to have been purchased during each month was less than the actual purchases made. Using round figures only, the return for August 1930 showed that 96,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 184,000 gallons. The return for September 1930 showed that 102,-000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 161,000 gallons. The return for October 1930 showed that 123,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 172,000 gallons. The return for November 1930 showed that 104,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 153,000 gallons. The return for December 1930 showed that 124,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 218,000 gallons. The return for February 1931 showed that 100,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 191,000 gallons. The return for March 1931 showed that 100,000 gallons had been purchased, whereas the Commonwealth contended that the actual purchases were 123,000 gallons. Totaling these, in round figures, we find that the returns for these 7 months showed purchases of 753,000 gallons, while the Commonwealth contended that the actual purchases were 1,205,000 gallons, a difference of 452,000 gallons.

Section 4 of the act in question provides as follows: "For the purpose of ascertaining the amount of the taxes, it shall be the duty of every such dealer and consumer to transmit to the department, on or before the fifteenth day of each month, upon a form prescribed, prepared, and furnished by the department, a statement or return, under oath or affirmation, of the liquid fuels purchased, sold, or used by such dealer or consumer during the preceding month".

Section 8 provides: "Any dealer or consumer . . . who makes any incomplete, false, or fraudulent statement or return hereunder . . . shall be guilty of a misdemeanor, and, upon conviction, shall be sentenced to pay a fine of not less than one hundred dollars or more than one thousand dollars, or, in the case of an individual or the officer or employe charged with the duty of making such statement or return for a person, firm, copartnership, association, or corporation, to undergo imprisonment not exceeding six months or both."

In section 1(a) "liquid fuels" is defined so as to include gasoline. In section 1(b) the word "dealer" is defined so as admittedly to include National Speed-

way Refining Company. In section 1(d) the word "department" is stated to mean the Department of Revenue of the Commonwealth of Pennsylvania.

Defendant's first contention is that there was no duty upon him to make a return and consequently he cannot be convicted of making an incomplete, false, or fraudulent return. The act provides that all dealers shall make returns. The word "dealer" includes corporations. The act does not state what officers of a corporation shall make its returns. Therefore, the corporation is "charged" with the duty of making a return, but no officer thereof is charged with this duty. It may be conceded that defendant would not be guilty of a misdemeanor because he failed to make a return on behalf of the corporation of which he was president, although an individual dealer who failed to make such return would be guilty of a misdemeanor. However, defendant undertook to make these returns. He swore to their truth before a notary public. The Department of Revenue was supposed to rely thereon. Having himself assumed to make these returns on behalf of the corporation of which he was president, he brought himself within the terms of the act and is liable thereunder if the returns were incomplete, false, or fraudulent. In other words, since the act imposes no duty upon the president of a corporation to make a return, defendant could not be punished for failure to make such return, but having himself undertaken to make the return he is criminally liable if the return is in violation of the statute.

Counsel for defendant next argues that the burden was on the Commonwealth to prove that National Speedway Refining Company actually purchased more gasoline than the amount reported by defendant, and that the Commonwealth failed to prove such fact by competent evidence. The evidence of the Commonwealth on this point was as follows: The main office and bulk plant for storage of gasoline of National Speedway Refining Company was at 625 Fishers Avenue, Philadelphia. Stephen C. Gilliard testified that he was agent of the Reading Company at Fourth Street and Erie Avenue, Philadelphia, in full charge of freight shipments at that point; that deliveries of gasoline in carload lots were made by the Reading Company to National Speedway Refining Company through the Reading depot at Fourth Street and Erie Avenue; that he had personal charge of all such deliveries and that the records in regard thereto were kept under his supervision; that among these records was a freight delivery receipt and a conductor's delivery ticket for each car; that upon arrival of a car at the Erie Avenue station, there would be made up a freight bill, an arrival notice, a freight delivery record, and a station record; that the car would be taken up to the siding of National Speedway Refining Company and would be receipted for by someone on behalf of that company; that this would be the freight delivery receipt; that these freight delivery receipts were kept among the records of Reading Company under his supervision; that these receipts showed date of delivery, name of consignee, name of consignor, place of origin of shipment, car number, nature of contents, and weight, and were signed by the consignee, National Speedway Refining Company, upon delivery. There were then introduced in evidence freight delivery receipts for the months of August, September, October, November, and December 1930 and the months of February and March 1931. It is important to bear in mind that these freight delivery receipts showed the quantity of gasoline in pounds.

The Commonwealth next proved that the books of Seaboard Midland Petroleum Corporation, the person shown by all the freight delivery receipts to have been the shipper of the gasoline delivered to National Speedway Refining Company, had its principal place of business in Baltimore, Md., and that its books were kept there. The Commonwealth further proved that every effort had been made to have the books of Seaboard Midland Petroleum Corporation in court at

the trial, together with proper officials of that company to testify in regard thereto, but that these efforts had been unavailing. The Commonwealth then placed on the stand Otto L. Stradley, who testified he was an accountant of many years' experience, and was at the present time in the employ of the Department of Revenue of the Commonwealth of Pennsylvania; that he, in June 1931 went to the offices of Seaboard Midland Petroleum Corporation in the City of Baltimore and made an exact copy of certain of the books of that company, including the book containing duplicate invoices for shipments of gasoline to National Speedway Refining Company. Copies of these invoices for the months in question were then offered in evidence. They showed date of the sale, name of the purchaser, designation of the shipment, nature of the shipment, quantity in gallons, and the car number.

The Commonwealth next proved that Seaboard Midland Petroleum Corporation maintains a bulk plant, from which deliveries of gasoline are made, at Eastwick in the southwestern part of the City of Philadelphia, at which there is a railroad siding, and that cars shipped from Eastwick over the Reading lines are handled through the Grays Ferry station of Reading Company, which is about three blocks away. The Commonwealth put on the stand Charles J. O'Neill, who testified that he is the supervising agent in charge of station operations of Reading Company in Philadelphia, and that the Grays Ferry freight office comes under his jurisdiction. Mr. O'Neill testified as to the method of making shipments from the Eastwick plant of Seaboard Midland Petroleum Corporation and as to the records which were kept at the Grays Ferry office of such shipments, which records, he testified, while not made by him, were made under his supervision. It appears that on the making of such a shipment a bill of lading would be prepared in triplicate, the first copy being sent to the consignee, the second being kept in the files of Reading Company, and the third being given to the shipper. Mr. O'Neill produced a large number of such bills of lading, which he testified he had taken from the files of Reading Company at Grays Ferry. These bills of lading covered the same period as was covered by the freight receipts produced from the office of Reading Company at Fourth Street and Erie Avenue, and contained the following information: date of shipment, name of shipper, name of consignee, place of delivery, car number, nature of freight, and quantity by weight.

We thus have copies of the records of Seaboard Midland Petroleum Corporation showing sales of gasoline to National Speedway Refining Company, copies of bills of lading from the records of Reading Company showing shipment of this gasoline, and copies of freight delivery receipts from the office of Reading Company at Fourth Street and Erie Avenue showing delivery. These three can be checked against one another, and when so checked it will be found that they agree. For example, the copy of the first duplicate invoice of Seaboard Midland Petroleum Corporation in point of time, Commonwealth's exhibit no. 17A, shows that a shipment was made on August 2, 1930, by Seaboard Midland Petroleum Corporation to National Speedway Refining Company, consigned to Philadelphia; that the shipment was gasoline, the amount was 9,951 gallons, and the car in which the shipment was made was no. CYCX1072.

Commonwealth's exhibit no. 24, being the duplicate bill of lading taken from the files of Reading Company at the Grays Ferry station, shows identical facts except that the quantity is given in weight as 66,660 pounds.

Commonwealth's exhibit no. 10A, being the copy of freight delivery receipt taken from the files of Reading Company at the Fourth Street and Erie Avenue station, gives identical information, the quantity being again stated as 66,660

pounds and the date of delivery being August 4, 1930, indicating that delivery was 2 days after shipment. In all three cases, Seaboard Midland Petroleum Corporation is named as the shipper, National Speedway Refining Company is the consignee, the product shipped is stated to be gasoline, and the car number is given as CYCX1072. The quantity in gallons appearing in the records of Seaboard Midland Petroleum Corporation and in pounds in the railroad records is reconciled by the testimony of Porter Howard, who has had many years' experience as traffic manager of Sun Oil Company. He testified that commercial gasoline weighs from 6.4 to 6.6 pounds per gallon, with slight additional variation due to temperature. If any invoice of National Speedway Refining Company is checked against the equivalent freight delivery receipt or bill of lading of the Reading Company, it will be found that pounds check against gallons at about the figure fixed by Mr. Howard. For example, on this basis, the first exhibits cited above show that the weight of the gasoline involved was 6.7 pounds per gallon.

Counsel for defendant contends that this evidence was inadmissible. With this we do not agree. We believe that it was evidence from which the jury might find as a fact that such deliveries had been made. If believed by the jury, the evidence would show that deliveries of gasoline were made in the months in question to National Speedway Refining Company in the amounts contended by the Commonwealth, and far in excess of the amount reported by defendant as having been purchased.

If counsel for defendant is correct in his contention, in order to prove that gasoline was delivered in certain quantities to National Speedway Refining Company, it would be necessary to put witnesses on the stand who could testify as to each car delivered, that he actually saw it delivered, that he tested it and it was gasoline, and that he measured it and it was so many gallons. Proof of this kind could never be produced in any case involving large quantities, and to state the proposition is, we believe, to show its absurdity.

But in our judgment, in view of the testimony introduced by the defense, the question as to whether or not these records were admissible is unimportant. The defense was not that such quantities of gasoline were not received, nor was it that correct returns were made. The defense was that mistaken returns were made in good faith, relying on advice received from an employe of the Department of Revenue. This, as pointed out in the charge of the court, was a perfect defense, if the jury believed the testimony on which it was based, but the jury did not believe it.

Defendant put on the stand Ben Stofman, who testified that he was the handyman around the office of National Speedway Refining Company; that he made up the returns in question and put them on defendant's desk for his signature. The testimony of Stofman shows that the returns were inaccurate and known by him to be inaccurate in regard to gasoline purchased. He testified that he made no effort to find out what purchases of gasoline were made by National Speedway Refining Company. He said that he started out with the gasoline inventory figures as of the beginning of the month; that to these he added taxable sales of gasoline made in Pennsylvania, and in some cases deliveries made to a station owned by National Speedway Refining Company in New Jersey; that he excluded all other sales in interstate commerce; that he then subtracted the inventory figures as of the end of the month and put down the resulting figure as gasoline purchased during the month. This figure would be purely artificial and necessarily less than the correct figure, because it excluded other sales in New Jersey. He said that he did this on the advice of an attaché of the Department of Revenue.

In this connection Stofman testified as follows:

"Q. Did you tell Mr. Handler? A. Yes. Q. Did he know the basis on which they were made up? A. Oh, yes. Q. So that Mr. Handler knew that the figures you had put down as to gasoline purchased, were not the correct figures but were figures computed in accordance with instructions received from the department? A. From the department."

Defendant, himself, after considerable evasion testified as follows:

"Q. Mr. Stofman said when he was on the stand—said he had received instructions from Mr. Jarvis and another employe of the Department of Revenue to the effect he was to return under that heading a net amount, and was not to include or to deduct the sales made in New Jersey, and he said he told you that, and you understood that, is that correct? A. I believe so—I believe he mentioned it once to me, and I asked Mr. Jarvis one time, and he said it was correct. Q. Stofman did say that to you? A. I believe he did mention it to me. Q. Then you know that 100,389 gallons was less than you purchased? A. I would not know the exact amount. Q. It would not include your New Jersey sales, according to your own statement? A. That is right. Q. So you knew it was less? A. As far as New Jersey sales, yes."

Since defendant admitted that he knew that the purchases returned were not correct, the evidence of records to which counsel for defendant object becomes unimportant. The only real issue was whether defendant had made the mistaken returns in good faith, relying on the alleged advice from the department. This was submitted to the jury, and there is no reason to believe their determination was incorrect.

Counsel for defendant contends that defendant could not be indicted, tried, and convicted in Philadelphia County. He bases this contention on the theory that the crime was not complete until the returns were received at the office of the department, which is admittedly at Harrisburg, in Dauphin County. Some of these returns were put in the mail by defendant in the City of Philadelphia, addressed to the department at Harrisburg, and others were left by defendant with the branch office of the department in Philadelphia and were from there mailed to Harrisburg. If the statute in question had provided that these returns should be *filed* in Harrisburg, the question involved would be close and interesting. However, it does not so provide. Section 4 provides: "It shall be the duty of every such dealer and consumer to *transmit* to the department . . . a statement or return." (Italics ours.) Section 8 makes anyone guilty of a misdemeanor "who *makes* any incomplete, false, or fraudulent statement or return." (Italics ours.) In other words, the vital words are "transmit" and "make". The duty is to transmit and the penalty is upon him who makes. The two words are apparently used interchangeably and synonymously. It would seem idle to argue that one who mails a return in Philadelphia addressed to Harrisburg "transmits" that return in Harrisburg. The transmittal is unquestionably in Philadelphia. Likewise, it seems idle to argue that one who signs and swears to a return in Philadelphia "makes" that return in Harrisburg. The return is "made" when signed, sworn to, and mailed. We therefore conclude that the crime was complete in Philadelphia, and that defendant was properly indicted and tried in this county.

What has been said above covers the motion for arrest of judgment as well as the motion for a new trial.

And now, to wit, June 30, 1933, the motion for a new trial is overruled.

And now, to wit, June 30, 1933, the motion for arrest of judgment is overruled.